608 S.E.2d 162

**Phillip J. DONAHUE, Appellant,**

**v.**

**MULTIMEDIA, INC., Multimedia Entertainment, Inc., Gannett Co., Inc., and Universal Television Enterprises, Inc., Respondents.**

**No. 3922.**

Court of Appeals of South Carolina.

Heard Nov. 16, 2004.

Decided Jan. 10, 2005.

334

Steven E. Farrar, Jack H. Tedards, Jr., William B. Swent and William J. Watkins, Jr., all of Greenville, for Appellant.

Donald A. Harper, N. Ward Lambert, Cynthia Buck Brown, James B. Pressley, Jr., Brent O. Clinkscale, all of Greenville and Robert C. Bernius, of Washington, for Respondents.

WILLIAMS, J.:

Phillip J. Donahue appeals a grant of summary judgment in favor of Multimedia, Inc., Multimedia Entertainment, Inc., Gannett Co., Inc., and Universal Television Enterprises, Inc.

("Respondents"), arguing the trial court erred in interpreting a longstanding contract between the parties under the applicable law of New York. We affirm.

## FACTS

The facts as set forth by the trial court are as follows:

Th[is] action arises from a 1982 contract between ... Phillip J. Donahue and [Respondents] ... providing for Mr. Donahue's performance as Master of Ceremonies on a television talk show.

On April 15, 1982, [Donahue] entered into a Contract for Services with Multimedia Program Production, Inc. (the former name of the Defendant MEI). This contract cancelled and superseded a 1978 contract between the parties.

Under the terms of the 1982 contract, [Donahue] agreed to serve as "Master of Ceremonies on the television program presently entitled 'Donahue' (the 'Program')." The parties further agreed in Section 10(q) of the contract that the laws of the State of New York govern its terms. The contract was subsequently amended four times. The amendments primarily adjusted the amount of remuneration due to [Donahue] and extended the contract's "term." Each iteration of the contract was for a definite term. The last amendment was entered into on October 12, 1994. Pursuant to that final amendment, the contract's term expired on August 31, 1996:

Extended Term: The term of the Contract shall be extended so that, as extended, it shall expire at midnight on August 31, 1996. (1994 amendment to Contract, Section 2)

The final amendment also provided that discussions between the parties regarding the continuation of any programming beyond the expiration date were to be commenced on or before May 31, 1995.

. . . .

Sometime before May 31, 1995, [Donahue] decided not to renew his contract with MEI beyond its August 31, 1996 expiration date.

In July 1995 ... Gannet Co., Inc. ("Gannett") submitted, and the Board of Directors of Multimedia approved, a

proposal for Gannett's purchase of the stock of Multimedia. Multimedia shareholders approved the proposal at a special meeting on November 15, 1995. Pursuant to that transaction, [Donahue] received a substantial payment for his Multimedia shares.

Following Gannett's acquisition of Multimedia stock, MEI continued to produce the "Donahue" program, and [Donahue] continued to perform his duties as its master of ceremonies. The last program was taped on April 29, 1996. The "extended term" of the contract expired on August 31, 1996 pursuant to its explicit terms.

Almost three months later, on November 21, 1996 ... Universal Television Enterprises, Inc. ("Universal") purchased the assets of MEI. Those assets included a group of videotapes of the "Donahue" program, characterized as the "Donahue Library."

(Trial Court Order dated August 15, 2002).

Section 6 of the contract, entitled *"Sale and Assignment,"* contains the following language:

Donahue agrees that Multimedia shall have the right to sell and assign this contract at any time during the term hereof. . . .

Notwithstanding the foregoing, Multimedia agrees that it will not so enter into a binding commitment during the term hereof ... for any assignment of rights and interests of Multimedia in the Program and in the distribution in syndication thereof which includes an assignment of this Contract without first consulting with Donahue and specifying and giving Donahue the option to meet the price and other related terms and conditions contained in the offer. . . .

In 2001, Donahue brought a breach of contract action against Respondents, arguing the Gannett and Universal transactions each constitute a violation of the contract's assignment clause and Donahue's right of first refusal. Donahue petitioned the court to have the transactions voided and sought exclusive ownership rights in the Donahue library. After reviewing voluminous materials submitted in support of both parties' positions, the trial court granted summary judgment in favor of Respondents. Following a Rule 59(e) motion by Donahue to alter or amend the trial court's initial order,

the decision to grant summary judgment was reiterated in a lengthy second order. This appeal followed.

## STANDARD OF REVIEW AND APPLICABLE LAW

■ The contract provides that its terms shall be subject to and construed in accordance with New York law. Because New York contract law does not violate South Carolina public policy, we find its application appropriate. *See Standard Register Co. v. Kerrigan,* 238 S.C. 54, 70, 119 S.E.2d 533, 541–542 (1961) (finding the laws of other jurisdictions, when deemed applicable by agreement, are generally enforceable in South Carolina unless repugnant to the public policy of this state).

■ The purpose of summary judgment is to expedite the disposition of cases which do not require the services of a fact finder. *Dawkins v. Fields,* 354 S.C. 58, 69, 580 S.E.2d 433, 438 (2003); *George v. Fabri,* 345 S.C. 440, 452, 548 S.E.2d 868, 874 (2001). Summary judgment is proper only when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *Laurens Emergency Med. Specialists, PA v. M.S. Bailey & Sons Bankers,* 355 S.C. 104, 108, 584 S.E.2d 375, 377 (2003). In determining whether any triable issue of fact exists, the evidence and all factual inferences drawn from it must be viewed in a light most favorable to the nonmoving party. *Sauner v. Public Serv. Auth. of South Carolina,* 354 S.C. 397, 404, 581 S.E.2d 161, 165 (2003); *Hendricks v. Clemson Univ.,* 353 S.C. 449, 455–56, 578 S.E.2d 711, 714 (2003).

New York law is consistent with South Carolina law with respect to summary judgment evidentiary standards. *See Dougherty v. Kinard,* 215 A.D.2d 521, 626 N.Y.S.2d 554, 555 (N.Y.App.Div.1995) ("Where there are no material and triable issues of fact, [a] motion for summary judgment should be granted.").

## LAW / ANALYSIS

### I. The Gannett Transaction

■ Donahue argues that Gannett's 1.7 billion dollar purchase of Multimedia's stock violated his contract with MEI

because the transaction constitutes an unauthorized "assignment" of the contract. We disagree.

In regard to this issue, we adopt the following sound analysis of the trial court:

There is no question that the 1995 stock purchase transaction was between Gannett and Multimedia, the parent corporation of MEI. MEI was not a party to the transaction. After Gannett purchased Multimedia's stock, MEI continued as a wholly owned subsidiary of Multimedia, and MEI's contract with [Donahue] continued as it had before the transaction. [Donahue] acknowledges that there were no changes in the daily operation of his program, in the persons to whom he reported, in the production of the program, or in his contract with MEI.

An assignment consists of three elements: (1) an assignor, (2) an assignee, and (3) transfer of control of the thing assigned from the assignor to the assignee. *Leon v. Martinez,* 84 N.Y.2d 83, 88, 614 N.Y.S.2d 972, 638 N.E.2d 511 (N.Y.1994); *see also* Restatement (Second) of Contracts § 317 (1981) ("An assignment of a right is a manifestation of the assignor's intention to transfer it by virtue of which the assignor's right to performance by the obligor is extinguished in whole or in part and the assignee acquires a right to such performance.").

The transfer of the stock of a corporation, however, does not constitute an assignment of a contract of that corporation. *See Dennis' Natural Mini-Meals, Inc. v. 91 Fifth Ave. Corp.,* 172 A.D.2d 331, 568 N.Y.S.2d 740, 743 (N.Y.App. Div.1991); *Rubenstein Bros. v. Ole of 34th [St., Inc.],* 101 Misc.2d 563, 421 N.Y.S.2d 534, 538 (N.Y.Civ.Ct.1979); *In re Pearl–Wick Corp.,* 15 B.R. 143, 147 (Bankr.S.D.N.Y.1981), *aff'd without opinion,* 697 F.2d 295 (2d Cir.1982). Here, Gannett did not purchase the stock of MEI, the party to the contract. Rather, Gannett bought the stock of Multimedia, the corporate parent of the contracting entity. Since the transfer of the stock of a corporation does not constitute an assignment of the corporation's contract, the transfer of the stock of the parent of a contracting corporation can hardly constitute an assignment of its subsidiary's contract.

(Trial Court Order dated August 15, 2002).

We find nothing in the language of Donahue's contract or the particularities of this transaction that would warrant, as Donahue argues on appeal, an interpretation of "assignment" which, in contravention to New York common law, would bar the sale of Mutimedia's stock to Gannett. As such, Gannett's purchase of Multimedia's stock did not breach any terms or conditions of the 1982 contract between MEI and Donahue.

## II. The Universal Transaction

### A. The Assignment Clause

■ Pursuant to Section 2 of Donahue's contract, as amended in 1994, the agreement's general term expired on August 31, 1996. In November 1996, MEI sold its assets, including the Donahue library, to Universal. Donahue argues this transaction violated the contract because his right of first refusal under Section 6 survived the contract's termination date and was not honored. We disagree, and again adopt the trial court's analysis:

> Section 6 of the contract governs the sale or assignment "during the term hereof" of the "rights and interests of Multimedia [the designation of MEI in this contract] in the Program and in the distribution in syndication thereof which includes an assignment of this Contract." As discussed [in the fact section of this opinion], this section afforded [Donahue] the "option to meet the price and other related terms and conditions contained in the offer of purchase of the Program and this Contract." Notwithstanding that Section 6 specifically applies only "during the term" of the contract, [Donahue] argues that since certain other provisions of the contract provided for "perpetual" rights, Section 6 should also be construed to bind MEI in perpetuity. An examination of the contract as a whole shows that such an interpretation is not tenable.

> . . . .

> While Sections 2(c) and 2(d) provide for royalty payments for any reruns of the "Donahue" program, those limited provisions do not extend other terms of the contract. [Donahue] had no continuing obligation to perform as master of ceremonies for MEI, and MEI had no continuing obligation

to produce and distribute the "Donahue" program without him.

The language of the Contract is unambiguous: it provided that the "term" of the Contract ended on a date certain, and that Plaintiff's "right of first refusal" lasted only during the term of the Contract:

> The term of the Contract shall be extended so that, as extended, it shall expire at midnight, August 31, 1996. (Contract, October 1994 amendment, ¶ 2).
>
> Notwithstanding the foregoing, [MEI] agrees that it will not so enter into a binding commitment **during the term hereof** ... without first consulting with Donahue ... (Contract § 6, emphasis added).

Section 6 of the contract and the Plaintiff's rights thereunder expired when the contract's "extended term" expired on August 31, 1996. After that date, MEI was free to sell and assign its rights in the Donahue Library as it saw fit. (Trial Court Order dated August 15, 2002).

 It is this court's duty to enforce the plain language of Donahue's contract. *Wallace v. 600 Partners Co.*, 86 N.Y.2d 543, 634 N.Y.S.2d 669, 671, 658 N.E.2d 715 (1995) ("It is axiomatic that a contract is to be interpreted so as to give effect to the intention of the parties as expressed in the unequivocal language employed ... clear, complete writings should generally be enforced according to their terms."). Donahue's right of refusal, as outlined in Section 6, is expressly limited to "the term" of the contract, which expired in August 1996. The fact that the parties expressly agreed certain provisions of the contract would last "in perpetuity" creates no ambiguity in terms expressly limited to the contract's general term. We therefore agree with the trial court that, as a matter of law, the transfer of MEI assets to Universal was in no way precluded by Donahue's right of first refusal as agreed upon in Section 6 of the contract.

### B. Contract for Personal Services

 Donahue also argues the trial court erred in determining the contract, at the time of the Universal transaction, lacked the indicia of a personal services contract. It is his contention that because MEI's right of assignment was, like

Donahue's right of first refusal, limited to the contract term, New York common law applies by default to all transactions occurring after the contractual termination date. He asserts that because the contract should be interpreted as one for personal services, New York law bars its assignment; thus, the Universal transaction is void. We disagree.

New York law, like that of many jurisdictions, employs an exception to the general rule of assignability of contracts when the contract is for "personal services." *Jennings v. Foremost Dairies, Inc.*, 37 Misc.2d 328, 235 N.Y.S.2d 566, 573 (N.Y.Sup.Ct.1962); *In re Compass Van & Storage Corp.*, 65 B.R. 1007, 1010 (Bankr.E.D.N.Y.1986) ("The nonassignability imprint of personal service contracts is firmly established New York law."). Even a personal services contract, however, may be assigned if the contract provides for assignment. *Preferred Oncology Networks of America, Inc. v. Bottino*, 1997 WL 305253, at *2 (S.D.N.Y.1997) ("Defendants represent to this Court that New York law does not recognize assignment of an obligation to provide personal services, yet neglect to inform the court that this prohibition is inapplicable when the parties expressly provide for assignability.").

Here, it is clear the parties contemplated possible assignment when entering into the agreement. During its entire fourteen-year term, Donahue's contract expressly granted MEI the right to assign, subject only to Donahue's option to meet any offered purchase price. These minimal restrictions on assignment lend little weight to the notion that the parties intended MEI's obligations to be of a "personal" unassignable nature once the contract expired. *See In re Compass Van & Storage Corp.*, 65 B.R. at 1011 ("Personal service contracts synthesize into those consensual agreements of ineluctable genre and distinctive characteristics that commit to a special knowledge, unique skill or talent, singular judgment and taste.")

Donahue presents to this court the proposition that exclusive distribution contracts are *per se* personal service contracts under the law of New York. In support of this position, he cites *American Can Co. v. AB Dick Co.*, 1983 WL 2198 (S.D.N.Y.1983), a case dealing with an exclusive distribution contract that *expressly* barred assignment and never mentions

the term "personal service contract." Without addressing this personal service contract *"per se"* argument, we conclude, as did the trial court, that Donahue's contract, following the expiration of its term, lacked the qualities of an exclusive distribution contract.

Section 10(f) of Donahue's contract grants MEI a perpetual, vested, and exclusive right in all "material" arising from the contract's performance. As such, MEI owned all right, title and interest in the Donahue library prior to the Universal transaction, provided they pay Donahue his percentage of any proceeds from its sale. According to Section 3 of the contract, MEI alone had the sole and exclusive right to distribute reruns of the program. As stated by the trial court:

> The Contract is not one ... whereby MEI or Universal serve as distribution agents for [Donahue]. Unlike agency distribution arrangements, where party B acts as a distributor of goods belonging to party A, in this case *one* party— MEI—distributes its *own* goods, and has full discretion to distribute the tapes or not, as it alone sees fit. MEI's only duty, and [Donahue's] only corresponding right, is to the transfer of a percentage of any proceeds realized from MEI's marketing efforts. That is all [Donahue] bargained for, and it is all the Contract gives to him. For this conceptual reason, in addition to the clear terms of the Contract, the agency cases relied upon by [Donahue] are simply irrelevant.

(Trial Court Order dated September 30, 2002).

Donahue downplays this proprietary distinction and calls our attention to two New York cases he asserts reflect that ownership of the product does not control the existence of an agency distribution contract. On the contrary, we find these cases take careful steps to establish the distributor did not have a true property interest in the subject matter of the contracts. *See Adrian v. Unterman,* 281 A.D. 81, 118 N.Y.S.2d 121, 127–28 (N.Y.App.Div.1952), *aff'd,* 306 N.Y. 771, 118 N.E.2d 477 (N.Y.1954) (holding a trademark, the subject of the distribution contract at issue, is "not the subject of property except in connection with an existing business" and "no property existed" in the use of one's name for the marketing of a product); *Bentley v. Textile Banking Co., Inc.,* 26

A.D.2d 112, 271 N.Y.S.2d 417, 419 (1966) ("[D]espite the words used describing the transactions as sales, no transfer of title [to the subject of the contract] was intended or took place."). Because Donahue's contract granted MEI ownership of the tape library and all material arising from the contract, the contract ceased to operate as an exclusive distributorship upon the expiration of the contract's general term. We therefore find his arguments regarding its status as a contract for personal services to be without merit.

## CONCLUSION

Because we conclude the Gannett and Universal transactions did not violate New York law or breach any terms or conditions of the 1982 contract between MEI and Donahue, the trial court's decision is

**AFFIRMED.**

HEARN, C.J., and GOOLSBY, J., concur.